IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:22-CV-168

VICTOR A. MALAFRONTE,

    Plaintiff,

v.

UNITED STATES OF AMERICA,

    Defendant.

## COMPLAINT

Plaintiff, complaining of Defendant, alleges and says:

### INTRODUCTION

1. This action arises out of the injuries suffered by thousands of servicemembers, civilian workers, and family members who were exposed to contaminated water at Marine Corps Base Camp Lejeune ("Camp Lejeune"). For more than three decades, toxic chemicals escaped from fuel tanks, industrial facilities, and other sources on and around Camp Lejeune and seeped into the groundwater below. By drinking, cooking with, bathing in, and otherwise coming into contact with that water, hundreds of thousands of men and women working and residing on base were exposed to these chemicals, greatly increasing their risk of contracting cancer and the myriad other life-destroying diseases they are known to cause. All along, the federal government officials charged by order and conscience to ensure the safety of Camp Lejeune's water failed to carry out that duty. Indeed, for decades the government did not even bother to test the water despite having a legal obligation to do so. And even after discovering the contamination in the early 1980s, government officials failed to warn the victims for decades that they were at increased risk for

serious health problems—preventing the screening and other measures that could have saved lives and mitigated harm.

2. As a result of their exposure to the contaminated water, thousands of men and women who lived and worked at Camp Lejeune from the 1950s to the 1980s have contracted serious diseases and chronic conditions, including—but by no means limited to—leukemias, cancers of the bladder, kidney, and liver, non-Hodgkin's lymphoma, and Parkinson's disease. Victims exposed in utero suffered from severe birth defects, and many did not survive. Indeed, so many infants died during the contamination period that one cemetery where hundreds are buried has taken on the grim title of "Baby Heaven."

3. After decades of delay and obfuscation, the federal government finally came clean about the extent of the contamination in 2008, when, pursuant to an express congressional mandate, the Marine Corps began notifying veterans and family members of their potential exposure. Claims against the United States seeking medical care and benefits for the victims of Camp Lejeune began to flow soon thereafter. But instead of providing the necessary care to servicemembers and others for their injuries, the United States resisted their claims vigorously. When lawsuits were filed under the Federal Tort Claims Act in federal court, the United States escaped liability by invoking North Carolina's ten-year statute of repose—which operated to bar all of the claims even though the government's misconduct had not come to light until well after the statutory period had run.

4. At long last, the United States has heeded calls to make good on its moral debt to those injured by their exposure to Camp Lejeune's toxic water. On August 10, 2022, the President signed into law the "Honoring our PACT Act of 2022" ("PACT Act"), which incorporates at Section 804 the Camp Lejeune Justice Act ("CLJA"). The CLJA establishes a simple cause of

action permitting individuals who were harmed by the contaminated water at Camp Lejeune over the relevant period to obtain compensation in this Court. Under the CLJA, "[a]n individual, including a veteran . . . or the legal representative of such an individual, who resided, worked, or was otherwise exposed (including in utero exposure) for not less than 30 days during the period beginning on August 1, 1953, and ending on December 31, 1987, to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States may bring an action in the United States District Court for the Eastern District of North Carolina to obtain appropriate relief for harm that was caused by exposure to the water at Camp Lejeune." PACT Act § 804(b). And to meet the burden of proof, a plaintiff need only "produce evidence showing that the relationship between exposure to the water at Camp Lejeune and the harm is . . . sufficient to conclude that a causal relationship is at least as likely as not." *Id.* § 804(c)(2).

5.  Plaintiff Victor Malafronte was stationed at Camp Lejeune on multiple occasions between 1963 and 1967. While on base, Mr. Malafronte began to experience severe, debilitating headaches that continue to afflict him to this day. He has subsequently been diagnosed with stage 4 chronic kidney disease and severe chronic interstitial nephritis. There is overwhelming evidence that the contaminants found in the water at Camp Lejeune caused, or were at least as likely as not the cause of, his injuries. Plaintiff now seeks compensation under the CLJA for substantial medical costs, loss of income, pain and suffering, and other injuries caused by the federal government's decades-long failure to ensure the safety of the water at Camp Lejeune.

## PARTIES

6.  Plaintiff Victor A. Malafronte is a natural person and resident of Escondido, California.

7.  Defendant United States of America has waived its sovereign immunity from suit under the PACT Act §§ 804(b) and (f).

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction under the PACT Act § 804(d) and 28 U.S.C. § 1331, because this action arises under the Constitution and laws of the United States.

9. Venue lies exclusively in this district under the PACT Act § 804(d).

## FACTUAL ALLEGATIONS

### I. Camp Lejeune's Water Is Highly Contaminated with Dangerous Chemicals for Over Thirty Years

10. Named for Major General John A. Lejeune, the 13th Commandant of the Marine Corps, Camp Lejeune is a United States Marine Corps base located just outside of Jacksonville, North Carolina. Established in 1941 and given its current name in 1942, Camp Lejeune has long served as a major training and service facility for the Marine Corps.

11. From the early 1950s to the mid-1980s, nearly one million servicemembers, their families and others resided at the base at various points in time.

12. The United States was responsible for the primary source of drinking water to servicemembers and other residents of Camp Lejeune through, among other means, a series of wells on the base.

13. Camp Lejeune's family housing areas were served by three main water-distribution systems—Hadnot Point (beginning in 1942), Tarawa Terrace (beginning in 1952), and Holcomb Boulevard (beginning in June 1972). Those systems consisted of a collection of wells, a water treatment plant, and a distribution system. They each served a distinct area of the base, except that before 1972 the Holcomb Boulevard area was served by the Hadnot Point system.

14. The following map, reproduced from a 2017 government report, depicts the three areas (Hadnot in green, Holcomb in pink, Tarawa in orange):



15. Beginning in the mid-1950s, toxic chemicals from various sources, including unlined landfills, leaking storage tanks, and a local dry-cleaning business, seeped into the soil and groundwater of Camp Lejeune and contaminated many of the wells used to supply the water-treatment plants. For many years, however, the United States failed to conduct testing of the water in violation of governing orders and basic duties of care.

5

16. In 1979, the United States Environmental Protection Agency ("EPA") promulgated regulations governing drinking water under the Safe Drinking Water Act of 1974, 42 U.S.C. §§ 300f *et seq.* To comply with those regulations, the Camp Lejeune water utility began testing drinking water at the base.

17. In the early 1980s, testing determined that the drinking water at both the Hadnot Point plant and the Tarawa Terrace water treatment plant was contaminated by volatile organic compounds ("VOCs") far in excess of safe levels. Because the two water systems operated independently of each other, they were necessarily contaminated from different sources, indicating major problems in and around Camp Lejeune.

18. The water from the Hadnot Point plant was principally contaminated by trichloroethylene ("TCE"), a degreasing solvent for metal equipment. An assessment commissioned by the United States Navy in 1982 found that the level of TCE in the Hadnot Point plant was as high as 1,400 parts per billion—***280 times*** the current EPA maximum containment level for TCE of ***five*** parts per billion.

19. The water from the Hadnot Point water treatment plant was also contaminated by other VOCs, including perchloroethylene or tetrachloroethylene ("PCE"), a solvent primarily used in dry-cleaning operations, benzene, and vinyl chloride.

20. The contamination of the Hadnot Point water primarily originated from leaking underground storage tanks, industrial area spills, and waste disposal sites.

21. The Agency for Toxic Substances and Disease Registry ("ATSDR"), an agency of the U.S. Department of Health and Human Services, has estimated that at least one volatile organic compound found in the Hadnot Point drinking water exceeded its current EPA maximum contaminant level at all times from August 1953 to January 1985.

22. The principal contaminant in the water from the Tarawa Terrace water treatment plant was PCE. In 1985, a PCE level of 215 parts per billion was detected. As with TCE, the current EPA maximum containment level for PCE is only five parts per billion.

23. The source of the PCE in the Tarawa Terrace water was the waste disposal practices at ABC One-Hour Cleaners—a private, off-base dry cleaner.

24. The ATSDR later estimated that PCE concentrations in Tarawa Terrace drinking water exceeded the current EPA maximum contaminant level for 351 months from November 1957 to February 1987.

25. In addition to the Hadnot Point and Tarawa Terrace distribution systems, the Holcomb Boulevard distribution system was intermittently contaminated by Hadnot Point water between 1972 and 1985. And as noted above, before 1972, the Holcomb Boulevard area was supplied with water by the Hadnot Point system.

26. Contractors and military scientists repeatedly raised alarms as testing throughout the early 1980s revealed the extent of the contamination. For example, as early as October 1980, the Laboratory Chief of the U.S. Army Environmental Hygiene Agency lab at Fort McPherson took the time to handwrite "Water is highly contaminated with low molecular weight halogenated hydrocarbons" on test results delivered to the Navy. And in early 1981 he issued a pointed, all-caps warning alongside the results of a subsequent test: "WATER HIGHLY CONTAMINATED WITH OTHER CHLORINATED HYDROCARBONS (SOLVENTS)!"

27. But despite these urgent early warnings, officials at Camp Lejeune did not take any steps to close the contaminated wells until benzene was found in the water at Hadnot Point in 1984, and they continued to move slowly even after that shocking discovery. Wells were gradually

7

removed from service over the course of 1984 and 1985, but contaminated water systems at Camp Lejeune were not fully shut down until 1987.

28. In 1989, the EPA named both Camp Lejeune and ABC One-Hour Cleaners "Superfund" sites under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601 *et seq*.

## II. Studies Confirm Severe Contamination of Camp Lejeune Water and Establish Links to Deadly Diseases

29. As required by CERCLA, the ATSDR conducted a Public Health Assessment ("PHA") of Camp Lejeune. The ATSDR completed its initial assessment in 1997.

30. The 1997 ATSDR PHA concluded that individuals who served or resided at Camp Lejeune had been exposed to contaminants of concern in the drinking water. It declared those exposures to be a public health hazard.

31. The 1997 ATSDR PHA was subsequently removed from the agency's website in 2009 after new information emerged, including the fact that benzene had been present in a well in the Hadnot Point system.

32. After the removal of the 1997 Public Health Assessment, the ATSDR completed five health studies[1] of Camp Lejeune:

    a. A 2013 study of whether *in utero* and infant exposures to contaminated drinking water were associated with birth defects suggested an association between drinking water contaminants and neural tube defects.

    b. A 2014 study compared mortality rates among Marine and naval personnel stationed at Camp Lejeune with mortality rates for Marine Corps personnel stationed at Camp Pendleton, a Marine Corps base located in Oceanside, California. The study found

---

[1] https://www.atsdr.cdc.gov/sites/lejeune/health-studies.html.

an elevated mortality rate for the Camp Lejeune personnel for several causes of death, including multiple myeloma, Hodgkin lymphoma, and cancers of the kidney, liver, esophagus, and cervix.

      c.     A 2014 study found that civilians who worked at Camp Lejeune from 1973 to 1985 had elevated mortality hazard ratios for kidney cancer, leukemias, multiple myelomas, rectal cancer, oral cavity cancer, and Parkinson's disease.

      d.     A 2014 study of mothers who lived at Camp Lejeune at the time of delivery suggested associations between TCE exposure and low birth weight and other birth issues. It also found an association between PCE exposure and the risk of preterm birth and an association between benzene exposure and term low birth weight.

      e.     A 2015 study identified associations between exposure to PCE and other chemicals in the Camp Lejeune drinking water and male breast cancer.

33.     In addition to those studies, the ATSDR employed water-modeling techniques and historical reconstruction to estimate concentrations of particular contaminants in drinking water over time and to determine the level and duration of human exposure to contaminated drinking water.

34.     In January 2017, the ATSDR published a superseding PHA[2] for Camp Lejeune.

35.     The 2017 Public Health Assessment reached a number of conclusions about the water supply at Camp Lejeune:

      a.     **Hadnot Point Water System.** The 2017 Public Health Assessment concluded that "[r]esidents, workers, Marine and naval personnel, and Marines-in-training at MCB Camp Lejeune were in the past exposed to contaminants in drinking water supplied

---

[2] https://www.atsdr.cdc.gov/sites/lejeune/2017-PHA.html.

9

by the Hadnot Point [water treatment plant]." It further concluded that "this contaminant exposure was at levels that could have harmed their health" and that "[t]he estimated levels to which all the above-mentioned groups of people were exposed could have resulted in an increased cancer risk and increased potential of experiencing adverse, noncancer health effects." According to the ATSDR, "[t]richloroethylene (TCE) and vinyl chloride were the chemicals that contributed most to the increased cancer risk."

    b.    **Tarawa Terrace Water System**. The 2017 Public Health Assessment concluded that "the Tarawa Terrace [water treatment plant] might have harmed the health of young children," including through "an increased risk of cancer," and that "Marines living in the Tarawa Terrace area who were exposed to water from the Hadnot Point [water treatment plant] during training may have had a higher risk of health-related problems."

    c.    **Holcomb Boulevard Water System**. The 2017 Public Health Assessment concluded that prior to 1972, when the Holcomb Boulevard Water System was served by the Hadnot Point water treatment plant, residents' exposure to contaminants "could have resulted in an increased cancer risk and increased potential of experiencing adverse, noncancer health effects."

    d.    **Lead exposure**. The 2017 Public Health Assessment concluded that "past exposure to lead found in tap water at 19 locations could have harmed people's health."

    e.    **Other Exposures**. The 2017 Public Health Assessment concluded that Marines and civilians who trained in indoor swimming pools in the Hadnot Point area between the early 1950s and 1985, as well as civilians who worked at laundry facilities, were exposed to contaminants at levels that might have harmed their health.

36. The ATSDR also released a report in January 2017 entitled "ATSDR Assessment of the Evidence for the Drinking Water Contaminants at Camp Lejeune and Specific Cancers and Other Diseases."[3] The report evaluated the links between the contaminants found in the water at Camp Lejeune and various diseases and chronic conditions. It found either "[s]ufficient evidence for causation" or "[e]quipoise and above evidence for causation" for the following diseases or chronic conditions with respect to at least one of the contaminants: kidney cancer, non-Hodgkin's lymphoma, multiple myeloma, leukemias, liver cancer, bladder cancer, Parkinson's disease, kidney diseases, systemic sclerosis/scleroderma, and cardiac defects.

### III. Congress and the Executive Branch Acknowledge the Harms Caused by Exposure to Contaminated Water at Camp Lejeune

37. Through statutory enactments and regulatory actions, Congress and the Executive Branch have both recognized the link between exposure to Camp Lejeune's contaminated water and a number of serious diseases and conditions.

38. In 2012, Congress enacted the Honoring America's Veterans and Caring for Camp Lejeune Families Act, Pub. L. No. 112-554, 126 Stat. 1165. Title I of the statute is entitled the Janey Ensminger Act, in honor of a nine-year-old girl who died of a cancer that she developed from exposure to the water at Camp Lejeune. *Id.* § 101, 126 Stat. 1167.

39. The Janey Ensminger Act entitles veterans and their families (including babies who were exposed *in utero*) who served or resided at Camp Lejeune for at least 30 days between 1957 and 1987 to receive hospital care and medical benefits for fifteen specified illnesses or conditions without having to prove a connection between a veteran's military service and the illness or condition. 38 U.S.C. §§ 1710(e)(1)(F), 1787(a) (2012). Those illnesses and conditions are

---

[3] https://www.atsdr.cdc.gov/sites/lejeune/docs/atsdr_summary_of_the_evidence_for_causality_tce_pce_508.pdf.

11

esophageal cancer, lung cancer, breast cancer, bladder cancer, kidney cancer, leukemia, multiple myeloma, myelodysplastic syndromes, renal toxicity, hepatic steatosis, female infertility, miscarriage, scleroderma, neurobehavioral effects, and non-Hodgkin's lymphoma. 38 U.S.C. § 1710(e)(1)(F).

40. Congress later expanded the pool of victims eligible for hospital care and medical benefits to include those who had served or resided at Camp Lejeune as early as August 1, 1953. Consolidated and Further Continuing Appropriations Act, 2015, Div. I, Tit. I, § 243, Pub. L. No. 113-235 (codified at 38 U.S.C. § 1710(e)(1)(F)).

41. In January 2017, the U.S. Department of Veterans Affairs promulgated a regulation establishing that veterans exposed to the water at Camp Lejeune are entitled to certain disability benefits. Final Rule, Diseases Associated With Exposure to Contaminants in the Water Supply at Camp Lejeune, 82 Fed. Reg. 4173 (Jan. 13, 2017). The regulation provides that a veteran who served at least 30 days at Camp Lejeune between August 1, 1953, and December 31, 1987, "shall be presumed to have been exposed during such service to the contaminants in the water supply." 38 C.F.R. § 3.307(a)(7)(iii). The regulation further provides that if the veteran develops one of eight specified diseases, the Department of Veterans Affairs "will presume that the individual concerned became disabled during that service" for certain purposes. 38 C.F.R. § 3.307(a)(7)(iv). Those eight diseases include two diseases not covered by the Janey Ensminger Act—liver cancer and Parkinson's disease—in addition to bladder cancer, kidney cancer, adult leukemia, multiple myeloma, aplastic anemia and other myelodysplastic syndromes, and non-Hodgkin's lymphoma. 38 C.F.R. § 3.309(f).

12

Case 7:22-cv-00168-BO-RN   Document 1   Filed 09/13/22   Page 12 of 19

42. Although the 2017 rule provides disability benefits to servicemembers, it does not provide other forms of compensation and it does not provide any compensation for non-servicemembers who were injured by the contaminated water at Camp Lejeune.

## IV. Claims Brought by Victims Under the Federal Tort Claims Act Are Consolidated and Dismissed

43. In the mid-2000s, a half century after the water at Camp Lejeune first became contaminated, the United States Navy began notifying affected individuals about "past water quality issues" at Camp Lejeune. In light of that disclosure, over four thousand veterans and other individuals filed administrative claims with the Navy seeking compensation for their injuries.

44. A number of injured servicemembers and others whose administrative claims were denied brought suits against the United States in various federal district courts under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671–2680.

45. As a general matter, the complaints alleged that the government was negligent in its maintenance of the water supply system at Camp Lejeune and had failed to comply with its duty to warn servicemembers and others about their risk of developing cancer and other diseases and conditions from exposure to the water at Camp Lejeune. The complaints explained that the United States had a legal duty to ensure that the water supply was safe for drinking and other purposes, properly constructing wells, and ensuring that the wells could not be contaminated by the surrounding land. The complaints pointed to orders issued by the Department of Navy Bureau of Medicine and Surgery in 1972, known as "BUMEDS," that imposed a detailed set of requirements for ensuring water safety quality—orders that the United States had failed to follow.

46. The complaints further alleged that United States personnel had themselves caused or permitted large quantities of chlorinated solvents and other contaminants to be dumped or disposed of within Camp Lejeune without warning residents. The complaints also alleged that

13

even after the United States knew or should have known that the water supply was dangerously contaminated, it failed to take the necessary steps to warn at-risk individuals and correct the problem.

47. In 2011, the Camp Lejeune cases were consolidated in a Multi-District Litigation (MDL) in the Northern District of Georgia (MDL No. 2218).

48. On October 14, 2014, the United States Court of Appeals for the Eleventh Circuit, in a certified interlocutory appeal in the MDL, held that CERCLA does not preempt North Carolina ten-year statute of repose, N.C. Gen. Stat. § 1-52(16) (2010). *Bryant v. United States*, 768 F.3d 1378, 1379 (11th Cir. 2014). The holding was required by the Supreme Court's decision in *CTS Corp. v. Waldburger*, 573 U.S. 1 (2014).

49. On December 5, 2016, the District Court dismissed the claims without reaching the merits of the plaintiffs' negligence and duty-to-warn claims. *See In re Camp Lejeune N.C. Water Contamination Litig.*, 263 F. Supp. 3d 1318 (N.D. Ga. 2016). The court based its dismissal in whole or in part on three alternative grounds: (i) the claims were barred by North Carolina's ten-year statute of repose, *see id.* at 1340; (ii) at least some of the claims brought by servicemembers were barred by the doctrine of *Feres v. United States*, 340 U.S. 135 (1950), *see Camp Lejeune N.C. Water Contamination Litig.*, 263 F. Supp. 3d at 1342–1343; and (iii) the claims were barred by the FTCA's discretionary-function exception, 28 U.S.C. § 2680(a), *see Camp Lejeune N.C. Water Contamination Litig.*, 263 F. Supp. 3d at 1360.

50. On May 22, 2019, the U.S. Court of Appeals for the Eleventh Circuit affirmed the district court's dismissal. *See In re Camp Lejeune, North Carolina Water Contamination Litig.*, 774 F. App'x 564 (11th Cir. 2019). The Court of Appeals based its affirmance exclusively on the

14

Case 7:22-cv-00168-BO-RN   Document 1   Filed 09/13/22   Page 14 of 19

North Carolina statute of repose and thus did not reach the other grounds for the District Court's decision. *Id.* at 568.

51. In the wake of the District Court's decision, the Navy elected to deny all of the thousands of pending claims seeking compensation for harms caused by the government's failure to ensure safe water at Camp Lejeune. The Navy took the position that it lacked the legal authority to pay the claims in light of the district court's ruling.

## V. Congress Enacts the Camp Lejeune Justice Act

52. On August 10, 2022, the President signed into law the Honoring our PACT Act of 2022, which incorporates at Section 804 the Camp Lejeune Justice Act. The purpose of the legislation is to supersede the judicial rulings that barred recovery under the FTCA for individuals injured by the contaminated water at Camp Lejeune by providing a new statutory basis for relief.

53. Section 804(b) establishes a new federal cause of action specifically for those affected by the extensive contamination at Camp Lejeune. It provides that:

> [a]n individual, including a veteran (as defined in section 101 of title 38, United States Code), or the legal representative of such an individual, who resided, worked, or was otherwise exposed (including in utero exposure) for not less than 30 days during the period beginning on August 1, 1953, and ending on December 31, 1987, to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States may bring an action in the United States District Court for the Eastern District of North Carolina to obtain appropriate relief for harm that was caused by exposure to the water at Camp Lejeune.

54. The CLJA "appl[ies] only to a claim arising before the date of enactment of this Act." PACT Act § 804(j)(1). The statute expressly incorporates the FTCA's requirement that a claim must be presented to the relevant federal agency before the judicial action may proceed. *Id.* § 804(h) (cross-referencing 28 U.S.C. § 2675). Under that provision, if the federal agency fails to make a final disposition of a claim within six months of its filing, the claimed is "deemed" denied, allowing the claimant to file an action in court. 28 U.S.C. § 2675(a).

55. The CLJA makes clear that a plaintiff may obtain a recovery for a "latent disease." PACT Act § 804(e)(1).

56. To meet the burden of proof under the CLJA, a plaintiff must "produce evidence showing that the relationship between exposure to the water at Camp Lejeune and the harm is—(A) sufficient to conclude that a causal relationship exists; or (B) sufficient to conclude that a causal relationship is at least as likely as not." *Id.* § 804(c)(2).

57. The CLJA includes its own statute of limitations and expressly makes inapplicable any other statute of repose or statute of limitations. *Id.* § 804(j)(2) and (3). The CLJA's statute of limitations provides that "[a] claim in an action under this section may not be commenced after the later of—(A) the date that is 2 years after the date of enactment of this Act; or (B) the date that is 180 days after the date on which the claim is denied under section 2675 of title 28, United States Code." *Id.* § 804(j)(2).

## VI. Victor Malafronte's Residence at Camp Lejeune and Injuries

58. Victor Malafronte was born on May 9, 1946. On May 10, 1963, just after turning 17, Mr. Malafronte enlisted in the Marines. After completing boot camp at Parris Island, he was sent to Camp Lejeune. Mr. Malafronte would spend the majority of his four years as a Marine—from September 1963 until his honorable discharge in June 1967—on the base.

59. While on base, Mr. Malafronte completed six separate 30-day stints of mess hall duties, which required him to clean with toxic water. Additionally, as an ammunition technician, he regularly drank water from "water buffalos" dispersed throughout the base. Mr. Malafronte was thus exposed to water polluted and contaminated as described herein with chemicals including but not limited to TCE, PCE, vinyl chloride, and benzene.

60. Mr. Malafronte suffered from severe headaches while stationed on base and was later diagnosed with stage 4 chronic kidney disease, and severe chronic interstitial nephritis.

61. Mr. Malafronte's exposure to the contaminants contained in the Camp Lejeune water supply caused or at least as likely as not caused his kidney condition and debilitating headaches. He was exposed to these dangerous chemicals, and studies have shown that such exposure leads to kidney disease and neurological damage that can result in debilitating headaches.

62. Mr. Malafronte has suffered greatly from his injuries. In addition to causing him pain and suffering, his conditions have prevented him from maintaining steady employment. Over the course of his 30-year post-service working life, Mr. Malafronte had over two dozen jobs, many of which his illness forced him to leave within a few months. During one particularly low point, he attempted to take his own life.

63. Ms. Malafronte presented an administrative claim for compensation to the United States Navy pursuant to 28 U.S.C. § 2675 in September 2011. The Navy later denied this claim in a letter dated January 25, 2019.

**COUNT ONE: CAMP LEJEUNE JUSTICE ACT**

64. Plaintiff respectfully incorporates by reference the allegations of the preceding paragraphs.

65. Plaintiff resided at Camp Lejeune, North Carolina for not less than thirty (30) days between August 1, 1953 and December 31, 1987.

66. During Mr. Malafronte's period of residence at Camp Lejeune, he was exposed to water that was supplied by, or on behalf of, the United States.

67. Ms. Malafronte suffers from debilitating headaches and has been diagnosed with stage 4 chronic kidney disease, and severe chronic interstitial nephritis.

68. A causal relationship exists between Mr. Malafronte's exposure to the water at Camp Lejeune and his diagnoses. The existence of the causal relationship is at least as likely as not.

69. Mr. Malafronte presented a claim to the United States Navy for money damages arising from his exposure to the water at Camp Lejeune, which claim was subsequently denied by the United States Navy.

70. As a consequence of his chronic headaches and kidney disease, Mr. Malafronte has suffered significant harm, including (but not limited to) medical costs, pain and suffering, and a reduced life expectancy.

## CLAIM FOR RELIEF

### (CLJA)

Plaintiff respectfully requests that pursuant to section 804 of the PACT Act the Court enter judgment against the United States and award damages and all other appropriate relief for the harm to her decedent that was caused by exposure to the water at Camp Lejeune.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and section 804 of the PACT Act.

Dated: September 13, 2022

/s/ Zina Bash
Zina Bash
KELLER POSTMAN LLC
111 Congress Avenue, Suite 500
Austin, TX 78701
512-620-8375
zina.bash@kellerpostman.com
Texas State Bar No. 24067505
*Lead Counsel for Plaintiff*

Warren Postman
KELLER POSTMAN LLC
1100 Vermont Ave., N.W.
Washington, D.C. 20005
202-918-1870
wdp@kellerpostman.com
District of Columbia Bar No. 995083
*Lead Counsel for Plaintiff*


/s/ W. Michael Dowling
W. Michael Dowling
THE DOWLING FIRM PLLC
Post Office Box 27843
Raleigh, North Carolina 27611
Telephone: (919) 529-3351
Fax: (919) 529-3351
mike@dowlingfirm.com
State Bar No. 42790
*LR 83.1(d) Counsel for Plaintiff* (in association with Keller Postman LLC)