IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:22-CV-168-BO

| | |
|---|---|
| VICTOR A. MALAFRONTE,<br><br>　　Plaintiff,<br><br>　　v.<br><br>UNITED STATES OF AMERICA,<br><br>　　Defendant. | AMICUS CURIAE BRIEF |

**Statement of Interest**

The undersigned counsel respectfully submits this brief as amicus curiae in support of the Court, Local Rule 83.1(e)(5) (the "Rule"), and Respondents Keller Postman ("Respondents" or "KP"). While it may seem odd that an amicus argues in favor of both sides, Counsel is in a unique position to provide the Court context regarding the passage of the Camp Lejeune Justice Act (the "Act") and how it was intended to be applied.

<u>To anyone who says the Act, in and of itself, brings justice to the claimants is clearly uninformed. The best we can do, when our government imposes upon us such an immeasurable harm, is to allow these individuals to go to Court</u>. Thus, the undersigned counsel has a strong interest in seeking a balance between allowing lawyers not admitted to practice in the Eastern District to advocate for their clients while supporting the Court's role in safeguarding its ability to administer an efficient and fair judicial process. As only through such a balance can we seek to provide the people contaminated by the water at Camp Lejeune with fair process.

1

**Argument**

I. **The Rule**

The Rule is similar to other jurisdictions which have the same goal in regulating who may practice law in its jurisdiction and make the practice of law a privilege not a right. It strikes a balance between respecting those attorneys who have been admitted to the District while recognizing that there are circumstances that require a non-admitted attorney to appear in a foreign jurisdiction on an expedited basis without taking advantage of the District. In that same vein, we also support Respondents' desire to represent their clients in the forum mandated by the Act: the Eastern District of North Carolina.

II. **The Purpose of the Act**

Although, it is a shame that it took such a tragedy to bring the political parties together to overwhelmingly pass the CLJA, it is an historic event that will forever impact those harmed by the toxic water at Camp Lejeune. During the process of shepherding the Act through Congress, North Carolina firms were engaged to assist in both the political and substantive aspects of the Act's passage. A lot of credit must be given to some very competent and tireless attorneys from North Carolina, without which it is doubtful that this legislation would have succeeded.

One of the unique aspects of this Act, is that it provides the ability for the Court to implement an efficient way to manage this litigation. When drafting the Act, the author[1] had this efficient process in mind. The Venue and Jurisdiction portions of the Act were intentional. The prior Camp Lejeune litigation which was mostly in the Eastern District was subject to an order of the Multi District Litigation (MDL) panel and all cases were consolidated in the United States

---

[1] James Edward Bell, III, President, Charleston School of Law and BLG's founding partner.

District Court for the Northern District of Georgia. The Act precludes the intervention of the MDL jurisdiction choices.

The Act requires that claimants, pursuant to section 804(h) of the Act, to file an administrative claim as a condition precedent to pursuing a claim for harm under the Act. There was purpose in inserting this requirement into the Act. With the large number of victims expected to file claims and the requirement that all claims be adjudicated in the Eastern District of North Carolina, the administrative requirement allows a "pause" in the process. The "pause" provides three critical opportunities.

First, it is everyone's hope that these cases can be resolved. The administrative "pause" was designed, in no small part, to allow a more efficient process and hopefully early resolution. For many, it is too late to see such resolution. For those whose time is short, delay is not helpful. Considering the unfairness already heaped upon the victims, timing of these decisions is a critical concern.

Second, recognizing the tremendous burden that the Lejeune cases may have on the Court, the administrative "pause" was designed to allow the Court time to put together and implement an effective Case Management Order system. The Act is a stand-alone statute that for the first time, allows individuals to sue the government for harms suffered by the exposure to the toxic water, without having to bring an action under the Federal Tort Claims Act. Additionally, since all of the claims must be filed in the Eastern District, the Court may soon be faced with thousands of litigants. However, there does not have to be a rush to the courthouse. Rather, under the Act, once a claimant files an administrative claim with the Navy, they are not required to immediately file a claim in an action at the end of 6 months but can instead wait until the two year anniversary from the date the Act was enacted. This time pressure release allows two things: (i) it allows the court

to take advantage of the administrative "pause" to organize the case and (ii) it allows for the selection of bellwether trials to carefully calibrate how these cases impact the court's judicial resources.

Importantly, the court is not without precedent in establishing the critical framework for these cases. The Federal Manual on Complex Litigation provides comprehensive guidance for courts faced with mass tort cases. For example, Section 22.32 advises courts to consider intradistrict assignment to a single judge for pretrial management. Section 10.221 identifies helpful organizational roles such as lead counsel, committees, and liaison counsel. BLG and Respondent have worked together with other firms both in and outside of the district, to develop ideas for how the case can be structured that ensures that the twin goals noted above are achieved.

Lastly, the Act was designed to allow the Government and plaintiffs' counsel to work collaboratively with the court to provide both parties time to give attention to the cases that may assist both sides in coming up with answers to some of the potential vexing questions and ultimately resolve these cases. We believe the Government has the best intentions to resolve the cases it can, but also recognizes the difficulty in handling the potential large number of filed cases.

**III. Interplay Between the Rule and the Act**

At first glance, it may appear that tension exists between Local Rule 83.1(e)(5), which properly regulates the practice of law in the Eastern District, and the Act, which mandates all attorneys (including out of state lawyers) to file their cases only in the Eastern District of North Carolina. However, there is no tension. The Rule is not so unyielding that the Act and the Rule are in competition. The Rule allows for those attorneys who wish to have a waiver apply to the Court for "leave" to represent additional parties.

In order for the Plaintiffs to be properly represented, they should be allowed to choose their own attorney. First, it is important to state that many of us are discouraged at the constant and sometime scurrilous advertising that has taken place in an effort to obtain clients. Some of these ads were by lawyers who have never handled an environmental case, and many have never actually been to court in any meaningful way. Such marketing undercuts and maligns the legitimate role marketing efforts play by allowing for a wide-spread dissemination of information to the public, thus, alerting claimants of their rights.

Legitimate marketing efforts inform the victims and survivors of Camp Lejeune, including our clients, who live across the country. In addition to the variety of geographic location, our clients' harms are also varied. Our clients have also been impacted differently: lung cancer, kidney cancer, bladder cancer, prostate cancer, breast cancer, renal and kidney disease, neurological defects, Parkinson's, Multiple Sclerosis, skin disease, and list goes on. It would be wrong to think that one firm or a handful of firms could deliver the quality of representation the victims and survivors of Camp Lejeune deserve.

Individuals make careful choices when selecting counsel. In making said choices, we hear from our clients, that geographic location, experience and "that human touch" are critical to their decisions and we believe those decisions should be respected. Herein lies the perceived "tension" between the Rule and the Act. However, allowing clients to choose capable advocates, wherever those lawyers may be admitted, and protecting the court's interest in the efficient administration of these cases by those who uphold the District's culture are not mutually exclusive. Indeed, allowing a diversity of competent counsel to advocate for clients is exactly what BLG's clients, Respondent's clients, and all victims and survivors of Camp Lejeune, need and deserve.

Conclusion

The court has the opportunity to craft an organizational structure for this case that would set the benchmark for mass litigation throughout the country and, most importantly, serve the needs of the individuals in accordance with the Act. That structure can welcome counsel from outside of the district whose experience and expertise is unmatched while also integrating the tremendous lawyers of the district. The Respondents meet this criteria. This structure can ensure that not only are clients receiving the best legal representation but that the culture of the district is respected and is not polluted by those seeking to turn this case into the next "mass tort" and move on when done. What is important to note is that these goals are not in tension with the Rule but rather, are embodied within the Rule; allowing for good cause for outside attorneys to practice within the Eastern District of North Carolina.

Respectfully Submitted:

Dated: October 19, 2022

*s/ Eric W. Flynn*
Eric W. Flynn (NCSB 57615)
J. Edward Bell, III
BELL LEGAL GROUP
219 Ridge Street
Georgetown, SC 29440
eflynn@belllegalgroup.com
jeb@belllegalgroup.com
Phone: (843) 546-2408
Fax: (843) 546-9604
