FILED
FEB 24 2023
PETER A. MOORE, JR., CLERK
US DISTRICT COURT
BY _____ EDNC
DEP CLK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF NORTH CAROLINA
# SOUTHERN DIVISION

No. 7:22-CV-168-BO

VICTOR A. MALAFRONTE,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

**AMICUS CURIAE BRIEF**

## Statement of Interest

The undersigned third party respectfully submits this brief as amicus curiae in support of the Court, Federal Rule of Civil Procedure 7.1, Local Rule 7.3, and Local Rule 83.1(e)(5), in relation to the amicus brief of October 18, 2022, submitted by the Bell Legal Group. The undersigned party supports the position taken by the Bell Legal Group in their amicus brief, but based on my unmatched experience and expertise in both the litigation finance industry originating and financing cases, as well as my prior military service while stationed at Camp Lejeune and the first-hand knowledge I have of the impact Camp Lejeune has had on veterans and their families, the undersigned feels compelled to raise significant issues that necessitate disclosure by attorneys seeking to practice under Local Rule 83.1(e)(5) in cases filed pursuant to the Camp Lejeune Justice Act (CLJA) despite any resulting personal financial liability.[1] Specifically, attorneys representing plaintiffs in CLJA cases before this court should be required to disclose information regarding their third-party litigation funders in a manner similar to the procedures set forth in Local Rule 7.3.

Clients and the Court should be made aware of who is financing CLJA litigation, and clients should be allowed to make an informed choice as to whether they want

---

[1] The undersigned party is prepared to provide additional information and documents as the Court deems necessary to further illuminate the compelling necessity to address this issue. The undersigned party, in the interest of protecting confidential information, has chosen not to include it in this brief but will comply with any order by the Court to provide additional information for an *in camera* review.

1

to proceed knowing who else their attorney may have an obligation to. Third-party litigation funding creates the potential for a conflict of interest for the plaintiff's attorney, as well as an incentive for funders to misrepresent, and a court taking steps to address these issues is not unprecedented. In 2018, the court in the national prescription opiate litigation issued an order disclosing details of any third-party contingent litigation financing.[2] This brief recommends the Court do the same, but order disclosures in even greater detail to reflect the gravity of the risks created by unscrupulous attorneys and predatory funders from profiting at the expense of taxpayers by taking advantage of veterans.

## Background

The Bell Legal Group brief of October 19, 2022, provides an exceptional overview of the legislative history behind the CLJA, and the undersigned adopts their summary of facts for purposes of this brief. What was not covered in their brief, however, is in an important aspect of the coming litigation under CLJA. The commercial interests of mass tort law firms, hedge funds, broker-dealers, and other third-party litigation funders create a substantial probability of a conflict of interest between an attorney's professional duties to her client and the commercial interests of the third parties funding that attorney's representation of her client.

To be clear, this brief is not meant to be an indictment of the litigation finance industry as a whole. Given the increasing complexity of products liability and other mass tort cases, third party litigation funding is quickly becoming the only way hundreds of thousands of Americans can have any hope of seeking justice when they are harmed. In many ways, litigation finance has levelled the playing field for plaintiffs. However, the lack of oversight and transparency in litigation finance has also created opportunities for fraud and created financial incentives that are not always aligned with the best interests of the plaintiffs.

*Litigation Finance, an Overview*

Traditionally, litigation finance has been a credit strategy available only to institutions and extremely wealthy, high net worth individuals. Lawsuits are an attractive asset class because they offer "a non-correlated, alternative investment class that offers the prospect of double-digit returns … when other asset classes are underperforming."[3] Third-party litigation funders, who are often but not always

---

[2] Order Regarding Third-Party Contingent Litigation Financing, *In Re: National Prescription Opiate Litigation*, Case No. 1:17-MD-2804(N.D. Ohio, May 7, 2018)
[3] https://thehedgefundjournal.com/the-emerging-market-for-litigation-funding/

2

hedge funds, "satisfy a niche in the market for legal representation, where neither the client nor its lawyers wish to (or are able to) bear the up-front costs and risks of financing a lawsuit."[4] Other entities, such as Stifel, are involved in "originating, syndicating, trading and brokering litigation-focused investments," and "act as the secondary market maker for the litigation funding industry."[5] In essence, litigation finance has created a cottage industry within the financial sector that has matured into a ubiquitous feature of mass torts and other high stakes civil litigation.

Third-party litigation funding, while often necessary to guarantee a plaintiffs access to the courts, is an extremely lucrative industry that has made many lawyers and financiers a staggering amount of wealth. As is evident from the explosive growth of divisions within entities like Stifel who specialize in lawsuit-based investments, litigation funding clearly creates financial interests by third-party non-litigants in the outcome of litigation. Lawyers involved in that litigation owe substantial sums of money to those third-party non-litigants. This creates the potential for conflicts between an attorney's ethical duties to clients and fiduciary duties to investors. At a minimum, these potential conflicts require disclosure and consent; however, no such requirement presently exists. Litigation finance currently does not merit the level of transparency other, more traditional asset classes do, though this is changing.

*Push for Greater Transparency*

Recently, the SEC released proposed rules for public comment that would, among others, require greater transparency in litigation finance.[6] Specifically, the SEC noted that the current disclosure forms hedge funds and other investment advisors are required to submit does not provide sufficient data for the SEC to properly assess the risk litigation finance may pose to investors. Trade groups such as the U.S. Chamber of Commerce are calling for even greater transparency as the market for litigation finance is valued in the tens of billions of dollars,[7] continues to grow and the threat posed by foreign entities funding litigation as a means of attacking the U.S. industrial base begins to emerge.[8]

---

[4] Id.
[5] https://stifelinstitutional.com/capabilities/fixed-income-capital-markets/
[6] https://www.sec.gov/rules/proposed/2022/ia-6083.pdf
[7] https://news.bloomberglaw.com/securities-law/hedge-fund-lawsuit-financing-poised-for-sec-enforcement-scrutiny
[8] Id.

3

The U.S. House of Representatives has pending legislation that directly addresses the lack of transparency in litigation finance. Specifically, the House is considering a bill that would require law firms to

> [D]isclose in writing to the court and all other parties the identity of any commercial enterprise, other than the named parties or counsel, who has a right to receive payment that is contingent on the receipt of monetary relief in the civil action by settlement, judgment, or otherwise.[9]

Additionally, U.S. Senators, notably U.S. Senator Dan Sullivan of Alaska (himself a former Marine) have advanced legislation to address what they perceive to be predatory practices and fraud aimed at potential plaintiffs under the CLJA. At least six other U.S. Senators joined Senator Sullivan in his proposal. This is in part driven by the enormous financial windfall attorneys and third-party litigation funders expect to receive from litigation under the CLJA. American Law Firm Capital principal Jeff Huff recently projected that financing litigation under the CLJA would yield a five to ten times return on investment. This is an extraordinary financial interest, one that dwarfs the interest of a Marine veteran who lives below the poverty line because of injuries from toxic exposure when that Marine served on Camp Lejeune.

*An Incentive for Fraud*

The lack of transparency and oversight in litigation finance highlighted by these public policy initiatives has hampered the SEC's examination and enforcement program and created opportunities for fraud and other wrongdoing. The lack of transparency has, among other things, permitted certain individuals who have disqualifying events under SEC Rule 506[10] and similar regulations, to openly participate in the business. For example, an individual named Howard Berger became involved in litigation with a firm for allegedly using, without their consent or knowledge, the firm's docket as collateral to secure funding for other law firms.[11] Mr. Berger has a lifetime ban from FINRA and was enjoined by the SEC in 2013.[12] SEC Rule 506 bars individuals with these disqualifying events from participating in transactions necessary for funding litigation. As is evident from the recent lawsuit, Mr. Berger simply substituted his previous securities fraud schemes with new litigation finance transactions.

---

[9] https://www.congress.gov/bill/117th-congress/house-bill/2025/text
[10] *See* 17 CFR § 230.506 - Exemption for limited offers and sales without regard to dollar amount of offering.
[11] Defendants' Answer and Counterclaims, *Legal Recovery Associates LLC v Brenes Law Group, PC and Troy A. Brenes*, Case No. 22 CV 1778 (So. Dist. N.Y., Mar. 3, 2022).
[12] https://www.sec.gov/litigation/litreleases/2013/lr22616.htm

4

In another example, an entity known as Mass Tort Nexus has a long-standing relationship with a number of prominent mass tort law firms. Mass Tort Nexus provides services that include docket valuation and helps law firms secure funding. Mass Tort Nexus is run by an individual named John Ray, who was formerly known as John Spicer, and was convicted of armed robbery and aggravated assault in Georgia in 1981.[13] Mr. Ray does not hold any securities licenses, is not a certified public accountant, nor does he have any extensive experience in the finance sector. Nevertheless, video testimonials from dozens of mass tort lawyers and firms, including Jeff Huff who projects five to ten times return on investment for CLJA cases, are publicly available and demonstrate the scope of Mass Tort Nexus' involvement in originating and financing cases.[14]

The involvement of Bad Actors in litigation finance is no secret within the industry. Attorneys are aware of these individuals' backgrounds yet persist in involving them in financing transactions. For example, attorney J. Ross Wallin, who runs the hedge fund Curiam Capital and frequently finances law firm dockets, admitted in a response to my New York bar complaint against him that Mr. Wallin became aware of John Ray's criminal background and still chose to continue to involve him in financing transaction. Mr. Wallin also admitted in his response to my bar complaint that he was aware of Howard Berger's lifetime ban and SEC injunction yet continued to involve Mr. Berger in financing transactions. Mr. Wallin's firm, Curiam Capital, is featured prominently in the recent lawsuit alleging fraud by Mr. Berger and Legal Recovery Associates.[15]

Third-party litigation funding incentivizes fraud in other aspects of mass tort litigation. Case origination, for example, is an area ripe for fraud. For example, in 2013 BP accused plaintiff's lawyers of filing claims for 40,000 nonexistent plaintiffs.[16] Mikal Watts was later prosecuted by the federal government for allegedly filing claims for the 40,000 non-existent plaintiffs. Given the financial windfalls American Law Firm Capital and others predict from CLJA litigation, the incentive for fraud is extremely high and case origination should be heavily scrutinized as well. Every dollar paid to unscrupulous attorneys for false claims is

---

[13] The undersigned learned of this information with the assistance of Brad Greer, the former Lawyer / General Counsel and Vice President of Government Affairs of Lifelock, as part of the due diligence process in a potential transaction. https://www.linkedin.com/in/brad-greer-995b574/details/experience/
[14] https://www.youtube.com/shorts/fBSLzJ_4YnQ
[15] Defendants' Answer and Counterclaims, *Legal Recovery Associates LLC v Brenes Law Group, PC and Troy A. Brenes*, Case No. 22 CV 1778 (So. Dist. N.Y., Mar. 3, 2022).
[16] https://www.bp.com/en/global/corporate/news-and-insights/press-releases/bp-files-suit-plaintiff-lawyer-fraud.html

5

a dollar that is ripped from the pockets of the American Patriots who volunteered to put their lives at risk for our national security.

The involvement of SEC Bad Actors and unscrupulous attorneys can have detrimental effects to clients. In the American Medical Systems transvaginal mesh Multi-District Litigation, for example, convicted felon Vincent Chhabra was involved in case origination and case financing for the firm McSweeney / Langevin. When the court learned of Mr. Chhabra's involvement, hundreds of cases that had already been resolved were remanded for new trials, and the plaintiffs in those cases suffered diminished awards. In the same case, individuals involved in case origination convinced potential plaintiffs to undergo unnecessary surgery to increase the value of their damages.[17] These documented incidents demonstrate the potential for substantial fraud in case origination and motives for plaintiffs to misrepresent, something that is relevant at trial and therefore something the US Justice Department is entitled to seek in discovery.[18]

The lack of transparency over third party litigation funders also permits individuals with little or no finance knowledge or experience to perform valuations in financing transactions. This lack of experience or credentials creates conditions for fraud because you have individuals providing valuations without well established, vetted methodology that is standard and expected in the rest of the finance sector. John Ray, for example, is not a certified public accountant and has no experience in the finance sector, yet routinely performs docket valuations for firms. Yet law firms rely on him frequently to value their underlying assets, potential awards for plaintiffs, which they then use to justify loans at favorable terms than they would otherwise not be entitled to.

As it currently stands, the SEC does not have visibility over entities like Mass Tort Nexus, Stifel, and American Law Firm Capital when they are engaged in financing litigation and therefore are often unaware if the transactions involve Bad Actors.

---

[17] See Complaint, *Plummer v. McSweeney, et al.*, Case no. 4:18-cv-00063 (E.D. Ark., Jan 24, 2018) (alleging "a deep running conspiracy to turn a potential defective medical product into a cash cow for a wide range of people including lawyers, doctors, and investors, but not for the women who had the potentially defective medical product installed in their bodies.")

[18] See *United States v. Abel*, 469 U.S. 45 (1984) (impeachment for bias governed by Rule 403 principles); *United States v. Lindemann*, 85 F.3d 1232 (7th Cir. 1996) (admissibility of extrinsic evidence of bias is governed by Rules 402 and 403, not Rule 608(b)); see, e.g., *Charter v. Chleborad*, 551 F.2d 246, 248 (8th Cir.1977) (fact that defendant's insurer employed witness "was clearly admissible to show possible bias of that witness"); *Yazdani v. BMW of N. Am., LLC*, 188 F. Supp. 3d 486, 495 (E.D. Pa. 2016) (admitting the plaintiffs' agreement with an insurer under FRE 411 to establish bias where the plaintiffs had named the insurer's employees as witnesses in the case).

These are the gaps that policymakers are seeking to close, but the existing rules do not provide the required disclosures necessary to mitigate the potential conflicts, or worse, fraud.

## The Rules

The Supreme Court has long recognized the danger that financing a lawyer to render legal services will "dilute his loyalty to his client." *Polk County v. Dodson*, 454 U.S. 312, 327 (1981).

The Federal Rules of Civil Procedure require financial disclosures in very limited circumstances. Fed. R. Civ. P. 7.1 only requires a nongovernmental corporate party to provide a disclosure statement that: "(1) identifies any parent corporation and any publicly held corporation owning 10% or more of its stock; or (2) states that there is no such corporation."

Local Rule 7.3 increases the scope of Fed. R. Civ. P. 7.1 by requiring all parties to a civil case, whether they are covered by the federal rule or not, to provide the same information required by the federal rule, as well as:

> (1) A trade association shall identify in the disclosure statement all members of the association, their parent corporations, and any publicly held companies that own ten percent or more of a member's stock;
>
> (2) All parties shall identify any publicly held corporation, whether or not a party to the present litigation, that has a direct financial interest in the outcome of this litigation by reason of a franchise, lease, other profit-sharing agreement, insurance, or indemnity agreement;
>
> (3) Whenever required by Fed. R. Civ. P. 7.1 or this rule to disclose information about a corporation that has issued shares to the public, a party shall also disclose information about similarly situated master limited partnerships, real estate investment trusts, or other legal entities whose shares are publicly held or traded.

None of these rules, however, requires plaintiffs' attorneys to disclose their third-party litigation funders, the terms under which the litigation is being funded, and the third-party funders' financial interest in the outcome of the case, namely because many of the institutions funding litigation are closely held business entities. The rules, as they currently exist, do not require attorneys to disclose to the court or clients any third parties financing the litigation, the contracts between

7

the lawyers and those third parties, or require any "know your customer" or "anti-money laundering" procedures to ensure there is no fraud in the financing that could have a detrimental effect on the client's case and potential award. The Court may, however, under 28 U.S.C. § 2071 and Fed. R. Civ. P. Rule 83, amend the local rules to require such disclosures. Further, the Court may, in its power to craft appropriate remedies, require disclosures of this kind in the individual cases before it.

The court in *In Re National Prescription Opiate Litigation* did as much by ordering "any attorney in any MDL Case that has obtained 3PCL financing" to, among other things,

> [S]ubmit to the Court ex parte, for in camera review, the following: (A) a letter identifying and briefly describing the 3PCL financing; and (B) two sworn affirmations – one from counsel and one from the lender – that the 3PCL financing does not: (1) create any conflict of interest for counsel, (2) undermine counsel's obligation of vigorous advocacy, (3) affect counsel's independent professional judgment, (4) give to the lender any control over litigation strategy or settlement decisions, or (5) affect party control of settlement.[19]

The court ordered these disclosures despite case law categorizing third-party contingent litigation financing documents as work product. Such an order was within the power of the court in the Northern District of Ohio, and is well within the Court's power here.

## Argument

Only through disclosure can plaintiffs make informed decisions as to whether their attorneys are free from conflicts of interest, in particular financial conflicts of interest that may influence an attorney to make decisions in the best interest of the third-party litigation funders and not in the best interests of the clients. Requiring disclosure of this kind was already ordered in the Northern District of Ohio in 2018. However, given the continued growth of litigation finance and the financial projections attorneys and financiers have made with upcoming CLJA cases, greater disclosure is required to mitigate the risks of conflicts and fraud. At a minimum,

---

[19] Order Regarding Third-Party Contingent Litigation Financing, *In Re: National Prescription Opiate Litigation*, Case No. 1:17-MD-2804 (N.D. Ohio, May 7, 2018)

8

the undersigned proposes the Court require attorneys representing plaintiffs under the CLJA to disclose to the Court:

    (a) the identities of the parties providing funding for the litigation or who otherwise have a financial interest in the outcome of the case;

    (b) the identities of the parties providing case origination services, broker-dealers who participated in securing funding, parties who performed valuation services for the attorneys' cases, and any other party known to the attorney who was involved in offering securities to finance the litigation; and

    (c) the terms of the litigation funding and any projected return third-party non-litigants with a financial interest in the outcome of the case expect to receive.[20]

The Court should further require attorneys to provide the contracts, term sheets, and other documents associated with any financing transaction in their case to the Court. Much like the SEC proposes to do with hedge funds, these contracts and term sheets can be provided ex parte and kept under seal to ensure confidentiality.

The undersigned further proposes that the court require attorneys representing plaintiffs under the CLJA to affirm in writing to the Court:

    (a) they have disclosed the same to their clients and advised on the third-party financial interests of the case;

    (b) their clients consent to further representation after having been so advised;

    (c) they have conducted due diligence in accordance with SEC and FINRA standards regarding the third-party non-litigants involved in financing the litigation; and

    (d) there has been no fraud in obtaining financing for the litigation.

This final proposed affirmation is akin to "control person liability" under Section 20(a) of the Securities Exchange Act. Section 20(a) makes executives and board members who facilitate or turn a blind eye to corporate wrongdoing liable even if

---

[20] Given the complexity and nuances of this litigation, the Court should consider the appointment of a "Special Master for Veteran Rights," with unmatched experience and expertise in the business of law that is free from conflicts of interest with existing litigants and funders. This Special Master can review law firm disclosures and advise the Court on the issues raised in this brief. Alternatively, this role can be filled by a member of a leadership steering committee, can be the committee's direct representative to the Court, can ensure compliance with a disclosure order, and make periodic reports to the Court that the order is being adhered to.

9

they did not actively participate in it.[21]  While the Court cannot impose the same criminal liability on attorneys that Section 20(a) imposes on executives, existing state bar rules, including those rules requiring candor to the court and the supervisory responsibilities and liability of attorneys over non-attorneys facilitating the delivery of legal services, provide some enforcement mechanism.

Litigation funding may have levelled the playing field for small plaintiffs against large, well-resourced defendants, but now the Court must level the playing field for those same small plaintiffs against the wealthiest and best resourced institutions seeking double or triple digit returns off the backs of those small plaintiffs. Disclosure of third-party litigation funding addresses Government concerns about foreign influence and reveals potential material that is relevant to defense counsel for cross-examination.  Ultimately, however, disclosure is about protecting clients. They are entitled to choose who represents them in the coming CLJA litigation. They cannot make an informed decision about whether their lawyer will act in their best interest if the third-party litigation funders advancing money to the clients' lawyers remain in the dark.  The Court can easily remedy this through amendments to the local rules.  Mandating disclosures of the kind detailed above is in line with SEC proposals, and client consent after disclosure is necessary to ensure the word "justice" in the Camp Lejeune Justice Act means anything.

Dated: February 24, 2023,                                   Respectfully submitted,

*/s/ Ronald S. Lasorsa*

Ronald S. Lasorsa (Pro Se)
1311 E Park Circle
Tampa, FL 33604
rsl@nobetteradvocate.com
(407) 516-0196

---

[21] *See* 15 U.S.C. § 78t(a)

10

## PROOF OF SERVICE

I certify that I have served a copy of this **AMICUS CURIAE BRIEF** on February 21st, 2023, by U.S. Mail on the following:

Zina Bash
KELLER POSTMAN LLC
1100 Vermont Ave., N.W.
Washington, DC 20005

W. Michael Dowling
THE DOWLING FIRM PLLC
Post Office Box 27843
Raleigh, North Carolina 27611

J. Edward Bell, III
BELL LEGAL GROUP
219 Ridge Street
Georgetown, SC 29440

*/s/*

Ronald S. Lasorsa (Pro Se)
1311 E Park Circle
Tampa, FL 33604
rsl@nobetteradvocate.com
(407) 516-0196

11

Case 7:22-cv-00168-BO-RN   Document 25   Filed 02/24/23   Page 11 of 11